419 So.2d 512 (1982)
James Richard DALY, Plaintiff-Appellant,
v.
L. E. MYERS CONSTRUCTION COMPANY, Defendant-Appellee.
No. 14902.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1982.
Rehearing Denied September 24, 1982.
Roland V. McKneely, Jr., Bossier City, for plaintiff-appellant.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendant-appellee.
Before PRICE, MARVIN and FRED W. JONES, JJ.
MARVIN, Judge.
In this worker's compensation action, the trial court awarded benefits under LRS 23:1221(4)(p) for serious permanent disfigurement about the face. The claimant appeals the judgment, contending that he is totally and permanently disabled because he can work only in substantial pain and seeks attorney fees and penalties, which were denied below. We amend and affirm. Jacks v. Banister Pipelines America, 418 So.2d 524 (La.1982).
Claimant had been employed about five years as a journeyman lineman by a utility construction company when the accident occurred the day after the tornado struck *513 Bossier City on December 5, 1978. Claimant was working above the ground in a hydraulic basket lift doing repair and clean up work near a bank of transformers. As claimant was sawing a twisted and partially broken utility pole it abruptly snapped and struck claimant across the face. Plaintiff was rendered unconscious and sustained a deep laceration of his left eyelid and cheek, a deviated septum, and a fracture of the cartilage of the nose.
Claimant was initially hospitalized for five days. His treating opthalmologist referred him to a plastic surgeon to correct an "ectropian" (an eversion caused by the scar on the eyelid that affects the function and lubrication of the lid against the globe of the eye). The plastic surgeon discovered the deviated septum and nose fracture and surgically corrected them when the other surgery was performed on April 22, 1979.
On July 5, 1979, the opthalmologist released claimant to return to work. Claimant sought and obtained a higher paying job as an "inside" electrician.[1] He worked at this job for eight months until March 5, 1980, when the job terminated because of economic conditions.
Claimant last saw his opthalmologist on March 19, 1979. The plastic surgeon referred claimant to a neurologist who saw claimant in June and October 1979, and on March 10, April 21, and May 30, 1980. The neurologist testified that claimant complained of daily headaches, some lightheadedness, and blurring of vision. Claimant took Tylenol with codeine, and later took other drugs such as Elavil and Midrin that were prescribed by the neurologist for pain and to induce sleep.
Claimant's complaints of headaches and dizziness were generally corroborated by two neighbors and by his foreman who supervised claimant for four months of the eight month period claimant worked as an inside electrician. The foreman testified that claimant's work did not require much physical strain, but that the mental strain of correctly installing cable that would carry high voltage was "really great". The foreman said that "once or twice during the day [the claimant] would be [seen] holding his head or leaning back with his eyes closed and [that claimant] had complained about headaches and sometimes dizziness... Sometimes [claimant] would start to work and complain about a headache or something like that and go on home, and a few times [claimant] would call and say that he would be unable to make [work] because of a headache." The foreman added, "whenever these headaches would get to a point to where [claimant] couldn't go on... he would stop and wait until the pain subsided and then he would ... finish up but ... would lag behind the other men..." The foreman explained that some of the work required the men to be 35-40 feet off the ground and that "you had to have real good balance and if ... you ... had any kind of history [of dizziness] then I wouldn't send anybody up there like that... if we couldn't move them to a different crew where they weren't doing high work we would ... have to lay them off."
For another employer, claimant worked for about 3½ weeks renovating and cleaning out a refinery reactor after his employment as an inside electrician ended. He was not employed at the time of the trial. Claimant complained that his daily headaches grew to such severity two or three days each week that he became dizzy and found it necessary to rest and take the prescribed medication to gain relief. Medical testimony relates the headaches to the trauma of the accident and predicts that the headaches will abate with time.
During the four months preceding the trial in September 1980, claimant sought work every week through his union hall by signing the lineman's book for work "out of classification".
We are thus presented with a claimant who worked nine of the fourteen months between his release to return to work and the trial of the case and whose claims of *514 substantial pain are corroborated by medical and lay testimony.
Total disability, whether permanent or temporary, is "disability ... to engage in any gainful occupation ..." § 1221(1), (2). Arguably, the claimant could be classified under lenient standards as totally disabled because he works in substantial pain. See Malone-Johnson §§ 276-277 and cases cited and discussed therein such as Phillips v. Dresser Engineering Co., 351 So.2d 304 (La. App. 3d Cir. 1977), writ denied. That authority cautions us, however, that this is probably the type of case which the legislature specifically intended to exclude from the total disability classification. Malone-Johnson, § 277 at p. 629. As suggested therein, the oddlot concept of classification, when coupled with the partial disability subsection, is appropriate to afford some relief to a claimant in such a situation and who is at a disadvantage in the competitive labor market. §§ 276-277.
Partial disability, as defined in § 1221(3), is disability "to perform the duties in which he was customarily engaged when injured or duties of the same or similar character... by which he was fitted by education, training, and experience."
We cannot fault the trial court, however, for awarding benefits under the specific loss-disfigurement subsection, § 1221(4)(p). In Jacks v. Banister Pipelines America, 418 So.2d 524 (La.1982), the trial court, affirmed by the court of appeal, awarded benefits for permanent partial disability. The same injury caused the permanent loss of vision in the employee's right eye. The employee lost three weeks of work following the January 1979 accident but continued to work thereafter essentially in the same capacity as before for the same and other employers at the same or higher wages. The supreme court approved the award for permanent partial disability and, "to assure that the employee is permitted to recover under whichever provision [specific loss or partial disability] affords him greater compensation", held that the employee "should be awarded compensation for the specific loss as a minimum, with reservation of his right to recover under the partial disability provision in the event it proves to be the more favorable." The decree of the supreme court, amending the judgment, was for "100 weeks of compensation according to the schedule for the specific loss ... and 350 weeks of partial disability compensation, subject to a credit for the portion of the compensation which has been paid."[2]
Here the evidence is uncontradicted that claimant has not been able to perform *515 the duties of a lineman or similar work requiring him to work at heights and that the claimant does work in pain when he works at ground level. Under these circumstances, we shall pronounce the same result as Jacks, recognizing that this claimant, if and when employable, may be able, as he has demonstrated, to earn more in some jobs than he would earn as a journeyman lineman. In such circumstances, the compensation liability of the employer is adjusted by the earnings of the employee, who effectively is subsidized until he is able to reach the basic earning capacity which the act guarantees. Jacks, supra, Malone-Johnson § 275.5.[3]
We have more difficulty dealing with claimant's contention that the trial court erred in denying penalties and attorney fees. Claimant named the employer as the defendant and propounded interrogatories about w.c. insurance coverage. The employer answered that it was covered by a w.c. liability policy in effect at the time of the accident with American Home Assurance Company. The interrogatories and answers were not introduced into evidence, however.[4] It was stipulated at the trial that certain correspondence had passed between claimant's counsel on the one hand and the adjusters and the attorney for the employer and its insurer between October 15, 1979, and June 24, 1980. This correspondence clearly sets forth demands that the claimant be paid worker's compensation and medical benefits.[5] The trial court awarded judgment on the outstanding *516 medical bills, but declined to award penalties and attorney fees because the employer was "covered" by w.c. insurance. Claimant asked for a new trial on that issue as well as on the issue of maximum benefits for disfigurement or for total disability. In ruling on the motion for a new trial, the trial court said that the first five items of the correspondence mentioned "establish that [the employer] was covered by work[er's] compensation insurance and that plaintiff is not entitled to recover ... penalties and attorney's fees."
The burden of proving that statutory penalties and attorney fees are due, of course, rests with the employee. See Malone-Johnson, § 389. LRS 23:1201.2, 22:658. Where the employer, however, relies on the existence of insurance coverage as a bar to its possible liability for penalties and attorney fees, the employer has the affirmative burden of proof. Maricle v. Cloud, 341 So.2d 29 (La.App. 3d Cir. 1976). Under the circumstances of this record, we cannot say that the trial court was clearly wrong in finding or inferring that the correspondence mentioned established that the employer was covered by w.c. insurance.[6] We do not reach the question of assessment of penalties and attorney fees against the insurer because the claimant did not join the insurer as a defendant.
Claimant was paid $9.60 per hour. He was paid $4,230 for the 30 weeks between the accident and the time he was released to return to work. The trial court awarded $100 per week for 100 weeks of compensation for disfigurement (§ 1221(4)(p)) subject to the credit of $4,230. Under Jacks, supra, this is correct because the trial court's award was for statutory disfigurement and the $4,230 was previously paid as disability payments. If the employer pays partial disability benefits hereafter, the credit is by the week rather than by the dollar, according to Jacks.[7]
In accord with Jacks, we amend the judgment of the trial court to award claimant w.c. benefits of $100 per week for 100 weeks for the scheduled disfigurement and for 450 weeks partial disability, from the date of the accident for a maximum of 450 weeks, however, and subject to credits that the law allows, including the 30 weeks of compensation previously paid for disability ($4,230), with legal interest on each weekly benefit from the date it respectively becomes or became due.
In all other respects and at the cost of defendant, the judgment of the trial court, as amended, is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] Claimant testified he sought this job because he was having dizzy spells and did not "feel" he could perform as a lineman should and because he needed the higher paying job to make more money and pay bills after being off work seven months.
[2] These credits may sometime be dollar credits and at other times weekly credits, depending on the character of the compensation benefit which is to be credited. The supreme court said:

"In order to assure that the employee is permitted to recover under whichever provision affords him greater compensation, he should be awarded compensation for the specific loss as a minimum with reservation of his right to recover under the partial disability provision in the event it provies to be the more favorable.
"If the employer is later required to pay the worker compensation for his partial disability, because it proves to be the more favorable remedy, the employer will be entitled to subtract the 100 weeks of compensation paid for the specific loss from the maximum number of weeks for which partial disability compensation is payable. This method of crediting the employer with payment under the specific loss schedule is derived by analogy from several provisions of the worker's compensation statute. The partial disability provision states that the employer is entitled to deduct one week from the maximum number of weeks for which compensation is payable for each week during which the employee is paid any partial disability compensation. La.R.S. 23:1221(3). If the employer is entitled to such a credit for each week in which he pays partial disability compensation, no matter how small the amount, he should receive comparable credit for any week during which he makes a maximum compensation payment because of the same injury under the specific loss schedule. In similar fashion, La.R.S. 23:1206 provides that any voluntary payment made by the employer which was not due and payable when made may be deducted from the payments to be made as compensation by shortening the period during which compensation shall be paid, and not by reducing the amount of the periodical payments. Analogously, if the employer in the present case should be required to pay partial disability compensation to the employee in the future because the worker has become unemployed or underemployed due to his injury, the employer should receive credit for his earlier payment due to that injury under the specific loss provision by shortening the period during which partial disability compensation is payable. The employer may not make deductions from any future disability compensation payments on a dollar for dollar basis, because such deductions are provided for only where the employer has first paid compensation under the total or partial disability provisions and compensation is later allowed under the specific loss subdivision. La.R.S. 23:1223." 418 So. 2d at p. 529. Footnote omitted.
[3] We recognize the problems of administering a continuous mechanism of disability payments under an adversary system, but this authority and responsibility is given to the courts. §§ 1224, 1331. Malone-Johnson, § 283. In this respect and as these statutes provide, the trial court, upon proper showing, may periodically change the judgment to correspond with changes that may occur in the employee's disability. § 1331.
[4] American Hardware Mut. Ins. Co. v. Stine, 341 So.2d 1301 (La.App. 3d Cir. 1977).
[5] We note that this accident occurred December 5, 1978, almost 10 months before claimant's counsel sent his October 15, 1979, demand letter. Copies of the medical bills, which were included in the judgment of the trial court, were mailed to counsel for the employer on February 18, 1980, and were earlier mailed to the adjuster for the insurer, according to the correspondence. This correspondence in part said:

"Mr. Charles Thomas
American International Adjustment Co., Inc.
One Shell Square, Suite 300
New Orleans, Louisiana 70139
 "In re: Claimant: James R. Daly
 Insured: L. E. Meyers
 Construction Co.
 Date of Accident:
 December 5, 1978
* * * * * * "Although Mr. Daly is disabled, he has received no compensation benefits since mid July, 1979.
"This letter should be considered formal demand for the immediate payment of all past due weekly benefits, together with the immediate commencement of the weekly benefits in the amount of $141.00.
* * * * * *
 "Very truly yours,
 "Roland V. McKneely, Jr."
"REFERENCE: Claim No. 0002-002-15-00
 Insured: L. E. Myers
 Claimant: James R. Daly
 D/L: 12/5/78
"Dear Mr. McKneely:
"This acknowledges your correspondence of 10/15/79.
* * * * * *
 "Very truly yours,
 s/Charles L. Thomas
 "Adjuster"
"These bills have previously been forwarded to the insurance company for payment and one of them was returned to me by Charles Thomas with the instructions that I should pay the bill from this office.
"All of the bills are considerably late and Mr. Daly is being pressured by Schumpert for payment. I would appreciate your seeing if you can expedite payment on these.
"The bills enclosed are as follows:

 (1) Schumpert Medical Center $313.40
 (2) Schumpert Medical Center 45.00
 (3) Drs. Carroll, Carlisle,
 Marshall, Williams & Peavy 16.00
 (4) Dr. Texada 10.00"

[6] The correspondence repeatedly refers to the defendant as the "insured" and states that bills have been sent to the "insurance company".
[7] See footnote 2, supra. See also Malone-Johnson § 285.

Arguing against an increase in the award for disfigurement, defendant suggests that the trial court generously awarded 100 weeks when the claimant was perhaps entitled to no more than 25 weeks, citing Lewis v. Orleans Parish School Board, 371 So.2d 328 (La.App. 4th Cir. 1971). The duration of compensation under § 1221(4) is arbitrarily fixed by statute and the courts have no discretion in fixing the period of compensation. See Malone-Johnson § 283, pp 654-655 and cases there cited. The courts have discretion in fixing the amount of compensation for the scheduled period, subject to the statutory minimum. § 1202.